# Hochreiter's Appeal.

B. and others filed a bill in equity against H. and others, alleging that they were the duly elected officers of an unincorporated society, and that defendants had possession of certain assets of said society which they proposed to sell or transfer, and prayed for injunction to restrain them. The defendants in their answer denied that they had any knowledge of any such incorporated society, but averred that defendants were the duly constituted officers of an incorporated society with which plaintiffs had been associated as members up to a certain time, when they refused to attend its meetings. It appeared from the report of the master, to whom the case was referred, that in 1866, an unincorporated society had been formed in which both plaintiffs and defendants were members, and that in 1872, said society had been duly incorporated by a decree of the Court of Common Pleas. No minute of the adoption of this charter appeared in the books of the company, but there was a minute of a reference of it back to the attorney who obtained it, for corrections. It appeared also that this charter was handed down with the other papers of the society by one president to another as they were successively installed. The master also found that, in 1875, a new constitution was prepared and declared carried, although not approved by three-fourths of the members present, as required by the constitution of the unincorporated society, and that said new constitution materially changed the objects of the society. It was under this new constitution the plaintiffs made their claim as set forth in the bill. *Held*, that there was sufficient evidence of the adoption of the charter without a formal minute thereof, and that therefore the bill must fail. *Held, further*, that even if the charter had not been adopted, the new constitution not having been adopted in accordance with the provisions of the existing constitution of the society, was illegal and of no effect.

March 9th 1880. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY and STERRETT, JJ. GREEN, J., absent.

Appeal from the Court of Common Pleas of *Luzerne county :* Of January Term 1878, No. 69. In Equity.

This was a bill in equity, filed by the German Catholic St. Nicholas Society, J. Baker, president, and others, against J. Hochreiter and others.

The bill alleged that said society was an unincorporated society ; that Baker and others were its duly elected officers ; that defendants were also members of said society, and that by virtue of their offices, the terms of which had expired, had obtained possession of the funds and assets of the society ; that defendants claim to be entitled to the possession and control of said assets ; that among these they have fraudulently combined to secure possession of certain promissory and judgment notes, which they are about to proceed to collect and transfer. The bill therefore prayed that defendants should be enjoined from collecting said notes or securities, or disposing of the same.

The joint and several answers of the defendants denied all knowledge of the existence of the society of the plaintiffs, or of its officers, and averred that, on the 22d of October 1872, " the Saint Nicholas Mutual Assistance Association was duly incorporated by the Court of Common Pleas of Luzerne county. That we

[Hochreiter's Appeal.]

were at that time, and have ever since been, members of the said incorporated society, and the plaintiffs mentioned in the bill were also associated with us in said society up to the 8th of June 1875. That there exists in the United States an organization known as the German Roman Catholic Central Association, which is composed of certain local associations throughout the said states. The said Central Association, at a general meeting held in Cincinnati, Ohio, in May 1875, adopted and prescribed a constitution for the several local associations within its organization, by the provisions of which the said local associations are placed wholly subject to the control and domination of the priests connected with them. That, on the said 8th of June 1875, the Rev. P. C. Nagle, priest in charge of the St. Nicholas Catholic congregation of the city of Wilkesbarre, came into the meeting of the said St. Nicholas Mutual Assistance Association, and proposed the adoption of the constitution as aforesaid prescribed by the said Central Association, by this society, in place of the charter and organization under which they had theretofore been acting. This was acceded to by the plaintiffs, but refused by the defendants, who declared that they would keep up their said former organization and charter. Whereupon, the plaintiffs and their associates withdrew from the said incorporated society, and have not since acted therewith, although duly notified by defendants and their associates that they would continue the organization under the charter aforesaid, which they have ever since done. And we, the said defendants, are duly elected and acting officers of the said incorporated association, and as such have been placed in possession and control of the property of said association, and all our acts in and about such property have been done simply in carrying out and discharging the duty devolving upon us as such officers. And we further answer that it is true that the notes and assets of the said association were, at least in part, acquired while the plaintiffs, or some of them, were members aforesaid; but we deny that when they thus wilfully abandoned the said association, they had any right to take any of the assets thereof with them, and make them the property and assets of another organization. And we further aver that the notes mentioned in complainants' bill, and the appendix thereto, are the sole and peculiar property of the said St. Nicholas Mutual Assistance Association, incorporated as aforesaid, and that complainants, by abandoning the said association, abandoned all right and title to said property and assets, both individually and collectively, as any other organization, and that complainants have at this time no right, title or property of any kind, in the said notes and assets, either legal or equitable."

The case was referred to an examiner and master, Charles E. Rice, Esq., who found the facts as set forth substantially in the opinion of this court.

[Hochreiter's Appeal.]

He also recommended that the bill should be dismissed. Exceptions were filed to his report, which the court sustained, Handley, A. L. J., delivering the opinion, and an injunction issued in accordance with the prayers of the bill. The defendants took this appeal and alleged that the court erred in this action.

*A. Ricketts*, for appellants.—The respondents are officers of an incorporated society, and the notes and assets are the property of such incorporated society, and placed in the hands of respondents as the proper custodians, and clearly the complainants have no right to maintain their bill against them.

The acts of the society sending the charter back to the attorney for correction, instead of rejecting it, requiring it to be returned to the society after correction, and watchfully observing that it should be kept continually by the successive presidents as one of the muniments, are sufficient, if there were no other acts of recognition and acceptance of it, to establish that the charter was accepted by the society.

But even if the charter was not accepted, the original constitution is still in force, and by its provisions a majority of three-fourths was necessary to alter it, and this number the complainants do not pretend to have had. The master has found that the constitution recommended by the Central Association did not have this requisite vote, and therefore it is not the constitution of the society : Schnoor's Appeal, 17 P. F. Smith 138 ; McAuley's Appeal, 27 Id. 397 ; Winebrenner *v.* Colder, 7 Wright 244

*H. W. Palmer* and *E. P. & J. V. Darling*, for appellees.—It was incumbent upon the respondents to establish their charter. The alleged secession of the complainants, was not from the old organization, but from the alleged incorporation. It was the new principles introduced by this alleged charter, that were inconsistent alike with the constitution of the old society, and that of the Central Verein. The defendants were bound to explain the alterations in their charter : Earl of Falmouth *v.* Roberts, 9 M. & W. 469 ; Starkie on Evidence (Sharswood's ed.) 501 ; Jordan *v.* Stewart, 11 Harris 249.

The learned master went beyond the issue presented upon the pleadings, and considered, and in fact decided upon the question whether the original constitution of the incorporated society of 1866 was materially altered by the adoption of the constitution in 1875, of the Central Verein. There is nothing in the pleadings that raised this issue. On the contrary, the pleadings confine the issue, as will appear by an examination of the respondents' answer, to the question whether or not the constitution of the Central Verein, as adopted in 1875, was in conflict with the alleged charter of the incorporated society of 1872. So that, when it was established-

12 Norris—31

lished that the alleged charter of 1872 was never accepted by the original society, there remained no question at issue.

Mr. Justice MERCUR delivered the opinion of the court, May 3d 1880.

This case was heard on bill, answer and report of the master. He reported in favor of dismissing the bill. On exceptions, the court reversed the conclusion of the master, and ordered and directed the injunction to issue as prayed for in the bill, and decreed in accordance therewith. From that decree this appeal was taken.

The bill was filed by persons claiming to be officers and members of "The German Catholic St. Nicholas Society," an unincorporated association, against the appellants, alleging they were members of the same society, and charging that they had unduly obtained possession and control of the money and assets of the society.

The appellants denied that they were members of that association, and claimed to hold the property in question as officers of the "St. Nicholas Mutual Assistance Association," a company duly incorporated; and averred that the appellees were also members of said corporation until they illegally withdrew therefrom.

The main questions arising in the case are, whether the association was duly incorporated, and, if not, whether the action of the appellees has been such as to give them a legal right to the possession and control of the funds in controversy.

In 1866 a beneficial association was formed, under the name of "The German Catholic St. Nicholas Society," commonly called "St. Nicholas Verein." Its main purposes were to aid and relieve sick and needy members, provide for a suitable burial of their dead, according to the rites of the Roman Catholic Church, and to care for the widows and orphans of deceased members. One of the qualifications necessary to admit a person to membership was that he must be an active member of the Roman Catholic Church at Wilkesbarre. The pastor of that church was permitted to attend the meetings of the society and to make motions, but had not the right to vote. Any alteration or amendment of the constitution required the agreement of three-fourths of the "present members." A majority could amend the by-laws. In the spring of 1872, according to the requirements of the constitution and by-laws, the society resolved to be incorporated in the name of "The St. Nicholas Mutual Assistance Association," or, in German, "St. Nicholas Verein," and prepared articles of incorporation, setting forth the objects of the association to be substantially the same as those of the previous society. The association was to be located in Wilkesbarre; and it was provided that "none but citizens of this Commonwealth can become members of this association," and did not

require that they should be active members of the aforesaid church of Wilkesbarre.

In May 1872, the articles, and a petition of members, were presented to the Court of Common Pleas of Luzerne county, and were directed to be filed and published. At the October Term following, a decree of incorporation was made. The validity of the charter is denied by reason of its alleged departure from the instructions given to the committee which prepared it. In the record of the decree on the continuance docket, and in the record-er's office, and also in the certificate attached to the charter, each shows the name was originally written "The St. Nicholas Mutual Assistance Association, called Wyoming Verein;" but in each of them the word "Wyoming" had been cancelled by drawing a line through it, and the words "St. Nicholas" written over. It does not appear by what authority the word Wyoming was written or afterwards changed. It is further objected that the minutes of the society do not show any vote taken on the question of accepting the charter.

The master, however, found as facts, that the charter was handed to the president of the society in December 1872, or in January 1873, and the bill of the attorney was approved and paid. In March and April following complaint was made that it was not correct. The objections appear to have been that the name was wrong; that it required members to be citizens of the Common-wealth, and did not require members to fulfil their obligations to the church of Wilkesbarre. It was therefore resolved that the charter be handed to counsel for correction. And it was so handed. In June following it was resolved that the committee who had been instructed to hand it to counsel, "care that the charter would be returned into the hands of the society." At the next monthly meeting it was brought in and handed to the president. Thence-forth until the close of the year 1874, this charter, with the other papers of the society and key to the desk were handed by each president to his successor as they were severally installed, as a part of the ceremony. Thus, for a year and a half after the char-ter had been returned to the association, it remained in the hands of the proper custodian thereof, and manifestly was accepted and recognised as the charter of the organization.

It seems to us the necessary inference is, that the association was fully informed as to all the provisions of the charter, and that the charter was accepted and adopted by the society, whereby the latter became a body corporate. Nor do we think the fact, that in January 1875, and again in March, objections were made to a president by reason of his not having performed his duty to the church, under the original constitution, sufficient to rebut the pre-sumption of previous acceptance and ratification. If this conclu-sion be correct, it is fatal to the bill. If, however, we should

concede this charter to be invalid, then the constitution of the original society remained in force. That required the agreement of three-fourths of the "present members" to change or amend it. It is only by virtue of an amendment that the appellees could maintain this bill. They claim the society adopted the general constitution of the "Central Society." If that pretended amendment or adoption is invalid, they have no standing to take the funds out of the hands of the minority who adhere to the society from which the others have seceded. If the appellees have, contrary to the constitution and government of the society to which they all belonged, severed their connection therewith, they cannot invoke the aid of a court of equity to take the property of the society from those who adhere to the organization, objects and government of the society: Sutler *v.* Reformed Dutch Church, 6 Wright 503; Schnorr's Appeal, 17 P. F. Smith 138.

The appellees claim that in June 1875, while they and the appellants were members of the same society, and at a meeting thereof, the amended constitution was adopted. The master has found there were at that time about 180 or 185 active members of the society. About 85 of which were present at the meeting. Before the question was put to the meeting on the adoption of the constitution, one of the appellants arose and protested against it, and produced a paper signed by more than 50 members of the society, declaring they would not accept the proposed constitution. When the vote was taken, about 50 or 55 members voted in favor of the adoption of the "Central constitution," and that the negative of the question was not put. Thus it appears that three-fourths of all the active members did not agree to the change, and less than one-third of them voted for it. Three-fourths of the members present did not vote in its favor: and more than the number requisite to defeat it, who were present and desirous of voting against it, were not given an opportunity to so vote. Hence, the very constitution under which the appellees claim to have acted was disregarded, and the master has found their action "was revolutionary." It therefore follows there was no legal adoption of the "Central constitution." He further found the attempt was to make a radical change in the objects of the society. We think the correctness of this conclusion is too clear to need argument. The changes are to the objects of the society, and the forms of government. Reference will be made to some of them. Previously, it was practically a mutual aid society only. The change was to make it a religious society, although retaining a mutual aid feature. The sectarian object was made fully equal to the mutual aid object. The question is not whether such a change may not have been beneficial. It is a question of power. Less than three-fourths of those present had no power to change the constitution. Whether the minority acted wisely or unwisely

[Hochreiter's Appeal.]

is a question which we cannot review. They had a legal right to hold the appellees to an observance of the constitution, and still retain their fealty to the church. The new constitution greatly enlarged the powers of the pastor. Thus, the names of the candidates must be submitted to him, and if he objects that the candidate does not fulfil his duties as a Catholic, the name must be withdrawn until the impediment is removed. If the society fail to exclude a member for certain reasons specified, the priest may move his exclusion. He has precedence over all other members in addressing the society. The names of officers elected must be reported to him. On request, the minutes must be submitted to him for inspection, and must not contain anything contradictory "to the prescriptions of the diocese." Members "must send their children to a Catholic school if possible." Thus, the power of passing on the qualifications of its members is practically taken from the society and given to the pastor, and he becomes the governing power of the society. The new constitution is radically so different, that it could not be adopted without the concurrence of three-fourths of the members present. It follows, therefore, the learned judge erred in reversing the conclusion of the master, and in decreeing otherwise.

> Decree reversed, and bill dismissed at the costs of the appellees.